[Cite as *Parm v. Shivers*, 2010-Ohio-6272.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| VALERIE PARM, | ) | |
| | ) | |
| PLAINTIFF-APPELLANT. | ) | |
| | ) | |
| VS. | ) | CASE NO. 09 MA 218 |
| | ) | |
| VINCENT SHIVERS, | ) | OPINION |
| | ) | |
| DEFENDANT-APPELLEE. | ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from Youngstown Municipal
Court of Mahoning County, Ohio
Case No. 08CVF3069

JUDGMENT:     Affirmed

APPEARANCES:
For Plaintiff-Appellant     Attorney Katherine E. Rudzik
26 Market Street, Suite 904
Youngstown, Ohio 44503

Attorney Patricia Dougan
First National Tower
11 Central Plaza, 7th Floor
Youngstown, Ohio 44503-1505

For Defendant-Appellee     Attorney Alan J. Matavich
205 Home Savings Bank Building
32 State Street
Struthers, Ohio 44471

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

Dated: December 13, 2010

DONOFRIO, J.

{¶1}   Plaintiff-appellant, Valerie Parm, appeals from a Youngstown Municipal Court decision in favor of defendant-appellee, Vincent Shivers, on her wrongful eviction claim and in favor of appellee on his breach of contract counterclaim.

{¶2}   Appellant and appellee became acquainted through appellant's friendship with appellee's late wife, Barb.  After Barb passed away, appellant learned that appellee had a vacant house.  Around this time, appellant separated from her husband.  She asked appellee if she could stay at his vacant house.  Appellee agreed.  Without signing a lease, appellant moved into the house in March 2007.

{¶3}   Appellant was unemployed when she moved into appellee's vacant house.  Appellant paid no rent for the first six months, the time period starting in March and ending in August 2007.  After gaining full-time employment, appellant began delivering monthly rent checks to appellee in the amount of $300.  A missing check from December 2007 notwithstanding, appellant made monthly payments of $300 to appellee from September 2007 through May 2008.  During this time, the electric, gas, and water bills remained in appellee's name, and appellee paid those bills.  Appellant contributed money toward the utility bills on only two occasions.

{¶4}   Wishing to have the utilities in appellant's name, appellee contacted the utility companies and learned that only appellant could transfer the bills into her own name. Appellee then informed appellant that either she transfer the utilities to her name or they would be shut off.  This occurred on Friday May 30.  On the following Monday, after appellant took no action to place the utility bills in her own name, the electricity was shut off.

{¶5}   With temperatures in the 90s and with no fans or air conditioning, appellant stayed in the house for two more days before moving into a hotel for a week and eventually into a one-bedroom apartment.  During the time when the power was shut off, appellant claimed to have lost approximately $500 worth of meat in her refrigerator as well as hundreds of dollars worth of food that was open and had to be thrown out during the moving process.  Appellant sued appellee claiming damages under a wrongful self-help eviction claim.

{¶6}   Appellee brought a counterclaim alleging appellant breached their oral

lease by not paying rent for the first six months, by not paying $550 dollars in monthly rent, and by not paying for utilities.

**{¶7}** A bench trial was held in the Youngstown Municipal Court. On November 30, 2009, the court entered judgment in favor of appellee both on appellant's wrongful eviction claim and on his counterclaim for breach of contract. The court awarded appellee $10,774.85 plus costs. Appellant filed a timely notice of appeal on December 30, 2009.

**{¶8}** Appellant raises two assignments of error, the first of which states:

**{¶9}** "THE JUDGMENT WAS AGAINST THE WEIGHT OF THE EVIDENCE."

**{¶10}** Appellant argues that appellee provided the court with no credible evidence to support his counterclaim. Appellant points out that appellee's testimony is the only evidence supporting the claim that the agreed-upon rent was $550 per month. Appellant argues that the letters written by appellee conflict with what he said in court. Specifically, appellee's first letter states, "I got the 300 dollar check." And appellee's second letter states, "Your 300 dollars a month do not pay the bills you generate." Appellant argues that these writings amount to an admission that the agreed upon rent was $300 per month.

**{¶11}** Appellant next points to appellee's actions in support of her position. Specifically, appellant refers to the fact that appellee repeatedly accepted her $300 payments. Appellant also brings up the fact that appellee never brought any legal action to evict her for non-payment of rent. Appellant argues that had the agreed-upon rent been $550, appellee would not have repeatedly accepted $300 payments without requesting the full $550 or commencing eviction procedures during the 16 months appellant lived at appellee's property.

**{¶12}** Regarding the utilities arrangement, appellant further argues against appellee's credibility. She points out that she never had the utilities in her name. And she points out that whenever she received utility bills, she delivered them to appellee. Besides paying these bills himself, appellee never brought any legal action to evict her for non-payment of utilities. Based on the fact that this situation persisted

for the length of appellant's tenancy, appellant calls into question the credibility of appellee's testimony that the parties originally agreed that appellant would be responsible for the utilities.

{¶13} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, at the syllabus. See, also, *Gerijo, Inc. v. Fairfield* (1994), 70 Ohio St.3d 223, 226. The court "must indulge every reasonable presumption in favor of the lower court's judgment and finding of facts." *Gerijo,* 70 Ohio St.3d at 226, (citing *Seasons Coal Co., Inc. v. Cleveland* [1984], 10 Ohio St.3d 77). "In the event the evidence is susceptible to more than one interpretation, [the court] must construe it consistently with the lower court's judgment." Id. The rationale of giving deference to the findings of the trial court is that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations to weigh the credibility of the proffered testimony. *Seasons Coal Co.,* 10 Ohio St.3d at 80.

{¶14} The trial court found that the terms of the oral lease were as follows: (1) appellant would pay $550 per month; (2) appellant would pay utilities. The court found that appellant failed to comply with these terms. Consequently, the court found appellant owed appellee $6,400 in overdue rent (dating back to March 2007), $907.25 for water, $1,122.93 for electric, and $2,344.67 for gas.

{¶15} We must examine the evidence to determine whether it supports the trial court's findings.

{¶16} Appellant testified that she entered into an oral lease with appellee to rent his vacant house on Upland Avenue and took up residence there in March or April 2007. (Tr. 6, 8, 14). According to appellant, she told appellee that she was unemployed at the time and he agreed not to charge her rent until she gained employment at which time she would pay him $300 per month. (Tr. 14-15). Appellant claimed that appellee agreed to this generous arrangement because she had been Barb's friend and Barb would have wanted appellee to help her. (Tr. 17).

Appellant testified that once she gained employment in September 2007, she began paying appellee $300 per month, which continued through May 2008. (Tr. 17-18).

**{¶17}** Appellant further testified that appellee told her to give him the utility bills when they arrived. (Tr. 15). She stated that for the 18 months that she resided at appellee's property, appellee never asked her to put the utility bills in her name. (Tr. 16). Only on two occasions did appellant contribute money toward the utilities. (Tr. 16-17).

**{¶18}** Appellant next testified regarding a letter she received from appellee. Appellant received a letter from appellee in her mailbox on May 30, 2008. (Tr. 19; Pt. Ex. 41). The letter stated that he had received the $300 check and a $150 gas check, that the gas, electric, and water companies were waiting on appellant to call and put the bills in her name, that appellee was taking his name off of the bills, that appellant had until June 2 to switch the bills to her name, and that if she failed to do so, the utilities would be shut off. (Tr. 19; Pt. Ex. 41). Appellant testified that she never agreed to put the utilities in her name. (Tr. 20).

**{¶19}** On June 2, appellant testified, the electricity was shut off. (Tr. 25). She stated that the temperatures were in the 90's then. (Tr. 25). Consequently, appellant testified she was forced to move into a hotel. (Tr. 26-27). Furthermore, appellant stated that she had to throw out over $500 worth of food. (Tr. 29-30).

**{¶20}** On June 5, appellee delivered another letter to appellant stating in part, "Your 300 dollars a month do not pay the bills you generate" and "No landlord pays their renter[']s bills." (Pt. Ex. 43).

**{¶21}** Appellant's daughters testified too but their testimony was not relevant to the terms of the oral lease.

**{¶22}** Janet Rogers, appellee's coworker, also testified. Rogers testified that she and appellee were working together one day in April 2008 when appellee put his phone on speaker so that she could listen to the conversation taking place between him and the woman with whom he was speaking. (Tr. 80-81, 83). She stated that appellee and the woman were discussing utility bills and other bills that were not paid. (Tr. 81). She stated that the woman explained to appellee that she was going

to put the utility bills in her name but that she did not have the money at the time. (Tr. 82). She further heard the woman acknowledge that she would pay for the various bills that appellee listed. (Tr. 82). Rogers admitted that she is not familiar with appellant's voice and could not identify it but the woman who she heard speaking acknowledged "living there." (Tr. 84-86).

**{¶23}** Finally, appellee testified. He stated that his late wife became acquainted with appellant through church. (Tr. 90). Appellee stated that appellant came to him, told him that she was having marital problems, and asked if she could move into his rental house. (Tr. 94). Appellee stated that he told appellant she could rent the house for the same terms he always rents the house: $550 a month rent plus utilities. (Tr. 96). He testified that these were the terms with both his previous tenant and his present tenant. (Tr. 96). Appellee testified that appellant agreed to these terms. (Tr. 96). However, appellant failed to pay any rent for March, April, May, June, July, or August 2007. (Tr. 97).

**{¶24}** Appellee stated that he asked appellant for the overdue rent "plenty of times" but appellant always stated that the money would be coming. (Tr. 97-98). Appellee testified that he felt sorry for appellant and wanted to help her out. (Tr. 98). Further, he believed appellant was going to pay him, so he did not ask her to leave. (Tr. 98-99). And he never sought to evict her. (Tr. 130).

**{¶25}** Appellee acknowledged paying the utility bills. (Tr. 100-101). But he stated that he was "constantly" telling appellant that she had to put them in her name and pay them. (Tr. 101). And he stated that appellant kept telling him that she would get the money. (Tr. 101). Appellee further stated that when appellant would pay him the $300 per month, she would tell him that the other $250 was coming. (Tr. 102).

**{¶26}** As to the phone conversation that Rogers testified listening to, appellee stated that appellant was the woman with whom he was speaking. (Tr. 104-106). He testified that during this call, appellant apologized for not paying the utility bills and claimed that she would switch the bills to her name. (Tr. 106). Appellee then gave testimony and offered exhibits of all of the utility bills accumulated during appellant's tenancy. (Tr. 110-21).

**{¶27}** Having reviewed the evidence regarding when the lease was to commence, the question becomes one of credibility. On the one hand, appellant's testimony implies the first six months were gratuitous. Supporting this notion, there is appellant's past assistance of appellee's wife as well as her troubled marriage and unemployment. There is also the fact that appellant paid no rent for the first six months without being evicted. On the other hand, there is appellee's testimony which the trial court found credible. Appellee testified that appellant was supposed to pay rent starting from when she moved in. Appellee also testified that he asked for the rent "plenty of times" in response to the nonpayment of rent in those first six months.

**{¶28}** Despite the differing testimonies, the trial court decided appellee's testimony was more credible. In doing so, the trial court did not err because there was competent and credible evidence, that being appellee's testimony, to support the fact that the parties agreed that the rent would be due beginning the first month. There is some evidence to the contrary. However, given the deference to the trier-of-fact regarding credibility issues, we cannot find the trial court's decision is against the manifest weight of the evidence.

**{¶29}** Regarding how much the agreed-upon monthly rent would be, again the testimonies of appellant and appellee differ significantly. According to appellant, the agreed-upon rent was $300 per month. According to appellee, the agreed-upon rent was $550 per month. According to the evidence, appellee repeatedly accepted appellant's $300 payments from September 2007 through May 2008. Appellee testified that appellant would give him the $300 and then promise to give the other $250, which she would never pay. Despite this allegedly inadequate payment, appellee never brought any legal action to evict appellee for non-payment of rent. In addition, appellee's letters to appellant state in part that, "I got the 300 dollar check" and "Your 300 dollars a month do not pay the bills you generate." These writings may seem to acknowledge that the agreed-upon rent was $300 per month. In contrast, appellee testified that the agreed-upon rent was $550 per month. And appellee testified that $550 is the amount of monthly rent paid by the tenants who occupied the house before and after appellant.

{¶30} Despite appellant's testimony, the trial court made the factual determination that the agreed-upon rent was $550 per month. This decision was supported by appellee's testimony. Given our position as a reviewing court that must indulge every reasonable presumption in favor of the trial court's finding of facts, we cannot find that the court's finding that rent was $550 per month was against the weight of the evidence.

{¶31} Regarding who was to pay utilities, once again the testimonies of appellant and appellee are at odds. According to appellant, the agreement was for appellee to pay the utilities. According to appellee, the agreement was for appellant to pay the utilities. On the one hand, the utilities were never in appellant's name. In addition, whenever appellant received utility bills, she delivered them to appellee. And besides paying those bills himself, appellee never brought any legal action to evict appellant for non-payment of utilities. On the other hand, appellee testified that appellant agreed to pay the utilities. And Rogers testified that in April 2008, she witnessed a telephone conversation between appellee and a woman who acknowledged that she would in fact pay the utility bills. Appellee's testimony was that the woman Rogers overheard was appellant. Rogers' testimony is corroborating evidence to appellee's testimony that appellant promised to pay for the utilities.

{¶32} Despite the differing testimony, the trial court decided that the agreement called for appellant to pay for utilities. Once again, because there was competent, credible evidence that appellant agreed to pay for the utilities, the trial court's decision was not against the manifest weight of the evidence.

{¶33} In sum, although there was conflicting testimony regarding the terms of the oral lease, we must construe the evidence consistently with the trial court's judgment. Because there was competent, credible evidence supporting the court's judgment, we must conclude that it was supported by the manifest weight of the evidence. Accordingly, appellant's first assignment of error is without merit.

{¶34} Appellant's second assignment of error states:

{¶35} "THE COURT FAILED TO PROPERLY APPLY ORC 5321.15."

{¶36} R.C. 5321.15(A) reads in part:

{¶37} "No landlord of residential premises shall initiate any act, including termination of utilities or services * * * against a tenant * * * for the purpose of recovering possession of residential premises* * *."

{¶38} According to appellant, the rental agreement called for appellee to pay the utilities. Under that alleged agreement, appellant contends that when appellee caused her electricity to be shut off, he wrongfully evicted her. Appellant alleges damages resulting from lost food and having to move into a hotel.

{¶39} The trial court found the oral rental agreement called for appellant to pay for her own utilities. We have already determined that finding was supported by the evidence. Under that agreement, appellant caused her own power services to be terminated when she did not put them in her name. Because the trial court found that appellant was responsible for the utilities, appellee had no obligation to have his name on the account in the first place.

{¶40} Hence, appellant's second assignment of error is without merit.

{¶41} For the reasons stated above, the trial court's decision is hereby affirmed.

Vukovich, P.J., concurs.

DeGenaro, J., concurs.